THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* GLENN E. SULLIVAN, Defendant-Appellant.

Fourth District   No. 13628

Opinion filed May 16, 1977.

MILLS, J., dissenting.

Richard J. Wilson and Ann L. Carr, both of State Appellate Defender's Office, of Springfield, for appellant.

Edwin R. Parkinson, State's Attorney, of Jacksonville (James E. Hinterlong and Robert M. Hansen, both of Illinois State's Attorneys Association, of counsel), for the People.

Mr. JUSTICE REARDON delivered the opinion of the court:

A Morgan county jury found the defendant, Glenn Sullivan, guilty of the May 29, 1975, armed robbery of the 104 Package Liquor Store in Meredosia, Illinois, a violation of section 18—2 of the Criminal Code of 1961 (Ill. Rev. Stat. 1973, ch. 38, par. 18—2). After entering judgment on the verdict, the court sentenced defendant to the penitentiary for a term of 8 to 24 years.

According to the testimony of eyewitnesses to the crime, two men with nylon stockings covering their faces entered the liquor store at approximately 5 p.m. on May 29, 1975. The store cashier, Margaret Easley, testified that the shorter of the two men was thin, attired in black plaid pants and armed with a "gun." The thin man remained at the door while his more heavy-set accomplice, who was attired in a Levi jacket and pants, went to the office and removed $179 from the cash drawer. This man had previously told the cashier to be seated and to place her head between her legs. At the same time, the thin man severed the store's telephone wire.

When the men finished, the heavy-set robber asked the cashier for her car's keys. She responded by saying the keys were under the car's front seat. After watching the men drive away in her blue and white Chevelle, the cashier fled to the store owner's home one block distant to call the police.

Morgan County Deputy Sheriff John Ryan testified that he received an armed robbery call at the county jail at 5:30 p.m. on May 29, 1975. After being given a partial description of the suspects and their car, Ryan and Sheriff Henry Jackson drove to Route 104 and then onto the Roegge Lake Road. As they proceeded eastward on the Roegge Lake Road, a green, four-door, 1968 Oldsmobile containing three persons passed them going in the opposite direction. The sheriff and deputy reversed their direction and were able to stop the Oldsmobile while both cars were still on the Roegge Lake Road. Defendant's alleged accomplices were the first to alight from the car, followed by the defendant who was wearing checked pants with no shirt. These pants matched the cashier's description of the pants worn by the robber who stood next to the liquor store door, armed with a gun. Thereafter, the men were transported to the Morgan county jail and charged with armed robbery.

The green Oldsmobile was transported to the Lowe Ambulance building in Meredosia where it was searched by the sheriff's staff. A knife was found on the automobile's dashboard and $47 was discovered in its rear seat. The suspects were also searched when they arrived at the county jail where $30 was discovered in one of defendant's socks, $54 on the person of another suspect and $48.40 on the other suspect. The money discovered on all three suspects totaled $179.40.

At trial, Esta Newman testified that on May 29, 1975, at 5:30 p.m., she was preparing dinner in her kitchen when she was distracted by a "funny colored" Oldsmobile containing three or four persons which had been stopped and then driven away from a spot near her home on the Arenzville Road. At approximately the same time, Dixie Kindred and Patricia Glover were driving in Mrs. Glover's car from Meredosia to the Glover residence on the Arenzville Road. They passed Esta Newman's

residence where they observed a new blue car with a white top parked on the east side of the road. The car was later discovered to be registered to the liquor store cashier, Margaret Easley. At the same time, the two women observed an older, dark-grey car with a caved-in front end tailgating their vehicle. The older car was driven by a lone male and the women noticed that two men were standing behind the new car, with one man leaning into the trunk. Mrs. Glover testified that one of the men standing behind the new car was "heavy-set" and that the grey car pulled off the road in the direction of the new car.

On the day following the robbery, the police discovered a blue denim jacket, a partially filled box of .32-caliber revolver shells and a fully loaded, six-shot, .32-caliber revolver beside the Roegge Lake Road. The revolver was owned by Douglas Quinn, who loaned it to Clarence Armstrong, one of defendant's alleged accomplices, on the date of the robbery. Quinn identified the defendant and Albert Matthews, defendant's other alleged accomplice, as the two individuals who accompanied Armstrong when he asked to borrow Quinn's weapon. Quinn also rode with the trio on the day of the robbery to the Jones Sporting Goods Store in a large grey car to purchase a box of .32-caliber shells for the revolver.

Witnesses for the State testified that the defendant escaped from the county jail on September 4, 1975, five days prior to the date his case had been docketed for trial. Defendant fled to Orlando, Florida, where he was again apprehended and turned over to Morgan county authorities who returned him to the County for trial. Defendant later stated, at his sentencing hearing, that the escape was prompted by a threat made on his life by a deputy sheriff.

■■■ In *People v. Davis* (1963), 29 Ill. 2d 127, 193 N.E.2d 841, our supreme court stated:

> "Flight from justice may be indicative of consciousness of guilt and, if unexplained, is a circumstance which may be considered by the jury, in connection with the other evidence in the case, as tending to prove guilt. (*People v. Schaffner*, 382 Ill. 266; *People v. Gibson*, 385 Ill. 371.) However, flight is not always dictated by an impulse or purpose to escape the consequences of acts done and, in some instances, is equally or more consistent with some other hypothesis. Accordingly, we have adhered to the view that if there are circumstances which would tend to explain or excuse the flight on grounds consistent with innocence, a defendant is entitled to show them. (*People v. Rappaport*, 362 Ill. 462; *People v. Bundy*, 295 Ill. 322.)" (29 Ill. 2d 127, 130-31, 193 N.E.2d 841.)

The court has recently held that necessity may be a proper defense or ground which could explain a defendant's flight from justice. (*People v.*

*Unger* (1977), 66 Ill. 2d 333, 362 N.E.2d 319.) In *Unger,* a defendant charged with the crime of escape (Ill. Rev. Stat. 1971, ch. 108, par. 121) was held to have properly attempted at trial to explain his flight from the State penitentiary by showing that his fellow inmates had threatened his life and sexually molested him. In the instant case, however, defendant did not attempt to explain his escape until after the jury had determined his guilt. Defendant did not offer an explanation of his escape until the sentencing hearing, when that explanation was permitted to be offered. Accordingly, we find no error in the admission at trial of testimony relating to defendant's flight.

On appeal, defendant presents two issues for our review: (1) whether the State's references to and presentation of defendant's alleged accomplices denied defendant a fair trial by informing the jury of the fact that the accomplices had previously been convicted of armed robbery; and (2) whether defendant's guilt was proved beyond a reasonable doubt. Since we decide this appeal on the basis of the first issue, we need not address the question presented to us in the second issue.

■■ As a general rule, evidence that an alleged accomplice has been convicted or has pleaded guilty to an offense for which the defendant is being tried is inadmissible against the defendant because competent and satisfactory evidence against one person charged with an offense is not *always* competent and satisfactory against another. (*People v. Burch* (1974), 22 Ill. App. 3d 950, 953, 317 N.E.2d 136, 139.) This, however, does not prohibit the State from presenting relevant accomplice testimony, whether that testimony is corroborated or uncorroborated. (*People v. Wilson* (1977), 66 Ill. 2d 346, 362 N.E.2d 291.) Rather, we mean to say that one charged with the commission of an offense must be tried upon evidence which logically tends to show his guilt or innocence, and not that which only shows another's guilt.

■■ Of course, there are narrow exceptions to the aforementioned general rule. When a conspiracy has been proved, the statement of one conspirator in furtherance of the plan is admissible in the trial of another conspirator as an exception to the hearsay rule. (*People v. Baer* (1976), 35 Ill. App. 3d 391, 398, 342 N.E.2d 177.) An accomplice's guilty plea might also be brought to the attention of the jury to impeach the accomplice's testimony or when defense counsel invites comment on the plea. *E.g., United States v. Bryza* (7th Cir. 1975), 522 F.2d 414, 425.

In the instant case, the prosecutor informed the jury in his opening statement that one of the defendant's alleged accomplices had confessed to the crime and that both alleged accomplices had been convicted of the crime. The prosecutor stated:

> "And we also think that the evidence will show that this defendant [Albert Matthews] in an oral statement later given to Officer

Charles Boston confessed that he participated in the armed robbery.

We also, I believe, will have the opportunity of hearing from the other two convicted armed robbers in this same instance, Clarence Armstrong and Albert Matthews, * * *."

The prosecutor's predictions regarding the testimony actually elicited at trial, however, did not prove to be entirely accurate. When placed on the witness stand, Matthews refused to testify and Armstrong stated little more than that he and Matthews had been convicted of the armed robbery.

Opening statements are made by attorneys to generally acquaint the jurors with the nature of the action, the issues involved and the facts expected to be proved. In *People v. Weller* (1970), 123 Ill. App. 2d 421, 258 N.E.2d 806, we stated:

"It is improper, however, for the opening statement to be a long narrative evidentiary recitation by the prosecution. An opening statement of facts purporting to recite evidence not followed by proof of the recited facts is error. See 14A, ILP, Criminal Law, §574, and cases there cited." (123 Ill. App. 2d 421, 427, 258 N.E.2d 806.)

Counsel may summarily outline the admissible facts which he, in good faith, expects to introduce during the trial, however, no statement may be made in opening which counsel cannot prove. *Gillson v. Gulf, Mobile & Ohio R.R. Co.* (1969), 42 Ill. 2d 193, 196-97, 246 N.E.2d 269.

■■ Here, it is clear that the prosecutor's opening statement contained improper references to defendant's accomplice's confession and to the accomplices' guilty pleas which were inadmissible at trial. The later presentation of those witnesses to the jury in shackles and the testimony of the accomplice named Armstrong compounded and highlighted whatever prejudice was present in the prosecutor's opening statement.

■■ For the purposes of this case, we note that a State witness, like a defendant, may be shackled for proper reasons when he appears in court. We find guidance in our supreme court's recent opinion in *People v. Boose* (1977), 66 Ill. 2d 261, 362 N.E.2d 303, which stated:

"The trial judge should state for the record his reasons for allowing the defendant [or witness] to remain shackled, and he should give the defendant's attorney an opportunity to present reasons why the defendant [or witness] should not be shackled. These proceedings should take place outside the presence of the jury. [Citations.]

Factors to be considered by the trial judge in making this determination include:

‘ [T]he seriousness of the present charge against the defendant; defendant's [or witness'] temperament and

character; his age and physical attributes; his past record; past escapes or attempted escapes, and evidence of a present plan to escape; threats to harm others or cause a disturbance; self-destructive tendencies; the risk of mob violence or of attempted revenge by others; the possibility of rescue by other offenders still at large; the size and mood of the audience; the nature and physical security of the courtroom; and the adequacy and availability of alternative remedies.' (*State v. Tolley* (1976), 290 N.C. 319, 349, 226 S.E.2d 353, 368; [citations].)"

(*People v. Boose* 1977), 66 Ill. 2d 261, 266-67, 362 N.E.2d 303; see also *People v. Brown* (1977), 45 Ill. App. 3d 24, 358 N.E.2d 1362.)

Here, however, our review of the record on appeal fails to disclose any reason for the presentation of the shackled witnesses to the jury. Indeed, the court ordered that the witnesses be unshackled as they stood before the jury.

Although defendant inexplicably neglected to object to the above-described errors at trial or in a post-trial motion, we will rule on his allegations because we find that the prosecutor's opening statement, the witnesses' shackles and the testimony of one of the witnesses constituted cumulative error which we are authorized to notice under the plain error doctrine of Supreme Court Rule 615(a) (58 Ill. 2d R. 615(a)).

In *People v. Hudson* (1972), 7 Ill. App. 3d 333, 287 N.E.2d 297, the Third District reversed a conviction for armed robbery after the defendant challenged police identification procedures, introduction into evidence of "mug shots" and testimony that defendant's fingerprints were on file with the Illinois Bureau of Investigation. The court stated:

"In summary, while we are of the opinion that none of the errors in the record, appearing singly, would necessarily require a reversal, the record as a whole leads us to the conclusion that justice will best be subserved by retrial of the case in a manner consistent with the views expressed in this opinion." (7 Ill. App. 3d 333, 338, 287 N.E.2d 297.)

The First District employed similar language in reversing a murder conviction when it stated:

"In sum, we hold that the reference to the pregnancy to [*sic*] the deceased and the admission of the hypodermic needle and the statement of the defendant were cumulative errors that deprived the defendant of a fair trial." *People v. Pendleton* (1974), 24 Ill. App. 3d 385, 397, 321 N.E.2d 433.

■■ Here, we conclude that the errors reflected in the record may not, standing alone, require reversal of defendant's conviction. We do find, however, that those errors have a cumulative effect which certainly did

deny defendant a fair trial. Pursuant to authority granted to this court in Supreme Court Rule 615(a), we reverse defendant's conviction for armed robbery and we remand for a new trial in accordance with this opinion.

Reversed and remanded.

CRAVEN, P. J., concurs.

Mr. JUSTICE MILLS, dissenting:

At best, the doctrine of "cumulative error" is a bucket of snakes. And, like the angels on the pin head, how many are *too* many?

It is, of course, a subjective test and I suspect that reasonable minds will ever differ. Such is the instant case apparently. I cannot concur in the final judgment of my brothers.

The obvious inference and conclusion that we must draw from their opinion is that not one of the errors, standing *solo,* would be sufficient to reverse this conviction. Neither the prosecutor's opening statement, the accomplice's testimony, nor the shackles on the witnesses—according to the majority—was sufficient to hold the trial unfair. Would two of the three have been sufficient? We will never know. But three, they say, is adequate—just enough weight in one balance pan to tip the scales for the defendant.

But here, the errors were not even preserved! There was not an objection, there was not a tendered instruction, there was not even a post-trial motion contesting these issues in the trial court! There was not one single action taken to register disquietude with the manner in which the subject errors evolved.

I am at a loss to comprehend how such alleged errors, standing alone being acceptable, and not found objectionable at trial, and not preserved by post-trial motions, can now—for the first time in the judicial process—be declared so horrendous and shocking as to require reversal.

I do not reject the "cumulative error" philosphy out of hand. But this, to my view, is not the case for its application. Three singularly innocuous errors, to which no objections were made, should not now be canonized by this court in what amounts to a trial *de novo* on those issues.

Furthermore, it was only via *cumulative error* that the *plain error* doctrine could be ultimately effectuated here since there was no preservation of error below. This is a shakey foundation indeed and I do not believe it sturdy enough to support a reversal of the trial court.

*Ergo,* my dissent.