THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. BRIAN WALKER, Defendant-Appellant.

First District (1st Division)   No. 1—07—1926

Opinion filed June 15, 2009.

Patricia Unsinn and Marion Buckley, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (James E. Fitzgerald and Peter Fisher, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE ROBERT E. GORDON delivered the opinion of the court:

Defendant Brian Walker, age 20, was convicted by a jury of felony murder, for the shooting death of 24-year-old Dehombre Barnett, a barbershop owner, during an attempted armed robbery at the victim's barbershop. In addition to finding defendant guilty of first-degree murder, the jury also found that defendant personally discharged the firearm that proximately caused Barnett's death. On June 22, 2007, defendant was sentenced to 35 years for felony murder, plus a mandatory 25-year enhancement for killing the victim with a firearm, for a total of 60 years in prison.

On this direct appeal, defendant claims: (1) that the trial court abused its discretion by allowing the State to proceed on solely a felony murder charge, thereby precluding defendant from seeking jury instructions on self-defense and second-degree murder; (2) that the trial court erred by refusing to allow the defense to present evidence that a co-offender was not charged; (3) that the trial court erred by refusing to give defendant's issues instruction on armed robbery; and (4) that defendant's sentence was both excessive and improper, because the trial court considered in aggravation matters that were implicit in the offense and facts unsupported by the evidence. For the following reasons, we affirm the conviction, but we remand for resentencing.

## BACKGROUND

A 12-count indictment initially charged defendant with first-degree murder, felony murder and attempted armed robbery. Before trial, the State dismissed all the charges except for one count, which was the count for felony murder, predicated on attempted armed robbery. On April 16, 2007, prior to jury selection, the prosecutor indicated the State's intent to proceed on solely the felony murder charge, and the defense offered no objection.

At trial, the State's evidence consisted primarily of: the defendant's written statement; testimony by witnesses who observed events immediately before or after the shooting; and forensic evidence from various sources, including a firearms examiner and pathologist. The only individuals inside the barbershop at the time of the shooting were: (1) defendant; (2) Matthew Moss, the uncharged co-offender; and (3) the murder victim. There were no witnesses at trial who described the actual shooting. Forensic evidence revealed that no gunshot residue was present on defendant's hands a few hours after the shooting.

The defense case consisted of stipulations that a police officer had recovered "two plastic bags of a crushed plantlike substance" from the victim's clothing and that the substances proved to be "narcotics." This evidence supported the defense theory of the case which was that defendant entered the barbershop to purchase marijuana from the victim.

At trial, Tasha Fuller testified that she was a hairdresser in the victim's barbershop and that she was working in the shop on the day of the murder. She testified that she was in the shop, both immediately before and immediately after the murder. However, at the moment of the murder, she testified, she was outside the shop and had just loaded various hair supplies into the trunk of her vehicle.

Fuller testified as follows about what she saw and heard on the day of the murder. On July 8, 2005, Fuller was working at the "Prototype" barbershop, which was located at the corner of Clyborn Avenue and Goethe Street in Chicago, and which was owned by Dehombre Barnett, the murder victim. At approximately 8 p.m., she was packing up some things and preparing to go home. The only other people in the barbershop at that time were Lavelle Archer, who was another barber, and Barnett. As Fuller was packing up, a man entered, asked Barnett the price of a haircut, and exited a few seconds later. After the man left, Fuller told Barnett that the man was "on some bullsh--." A few seconds later, the man reentered, accompanied by defendant. Defendant sat down in one of the barber chairs, while the other man stood next to defendant and spoke with Barnett. Fuller exited the shop, placed some things in her vehicle, and returned to the shop. Shortly after she returned, defendant and the other man exited the shop together.

Fuller further testified as follows. Barnett's cousin Marvin[1] entered the shop; and then Archer (the other barber) and Marvin eventually left. Fuller was still packing up, when defendant and the other man reentered the shop together. Fuller walked past the two men, and while standing behind them, she turned and gave Barnett "a look like is everything okay." Barnett nodded "like it was okay for [Fuller] to leave," and Fuller said that she would see Barnett tomorrow. Fuller exited the shop, placed some things in the trunk of her vehicle and entered her vehicle. While sitting in the driver's seat, Fuller heard two gunshots coming from the shop and then she saw defendant and the other man running down the street.

---

[1]Fuller did not identify Marvin by his last name. Thus, when describing Fuller's testimony, this opinion will refer to him by his first name.

Fuller further testified as follows. After exiting her vehicle, she looked for Barnett through the windows of the shop and could not see him. Marvin was walking back toward the shop. Fuller grabbed Marvin by the arm and told him to accompany her into the shop, because she believed the two men had shot Barnett. When Marvin and Fuller entered the shop, they saw Barnett lying on the floor, with "blood all around his head." The police and an ambulance arrived shortly after. Later that day, Fuller picked the defendant out of a police lineup and identified him as one of the two men whom she had seen running out of the shop.

On cross-examination, Fuller testified that she had known Barnett approximately eight years, prior to his murder, and she denied knowing either that he sold drugs out of the barbershop or that he carried a gun. Fuller identified a photograph of the other man who had entered the shop with defendant.

The State's next witness was Marvin Pierce, the victim's cousin who, with Tasha Fuller, discovered the victim's body. Pierce testified as follows. On July 8, 2005, he lived only a block from his cousin's barbershop. At approximately 8:15 p.m., he walked over to the shop to visit Barnett. As he was walking, he observed defendant and another man. Pierce, who was 19 years old at the time of the offense, had known defendant since the fourth or fifth grade. While Pierce did not "personally" know the other man, he recognized him generally. Defendant and his companion were on the sidewalk, approximately 35 feet away from the corner where the barbershop was located. As Pierce approached, he noticed "a brown handle of a gun sticking out" of the left pocket of defendant's shorts. Pierce nodded to defendant as he walked by and continued toward the barbershop. While Pierce was talking to Barnett inside the barbershop, defendant and his companion entered the shop, together. At that time, the only people inside the shop were Pierce, Barnett, defendant, defendant's companion, and Fuller, who was "gathering all type of hair equipment."

Pierce testified as follows. Pierce exited the shop, and he was walking north, toward his home, when he heard two gunshots coming from the barbershop. Pierce turned around and saw defendant and his companion, running toward him. Pierce then headed back to the barbershop, where he observed Barnett lying on the floor, with blood around him. Fuller was also present. A few minutes later, the police arrived and Pierce informed them who had been in the shop. The next day, Pierce identified defendant out of a police lineup.

On cross-examination, Pierce testified that prior to his visit at approximately 8 p.m. on July 8, 2005, he had already been to the shop two or three times that day. Pierce denied knowing either that Barnett

was selling marijuana out of the barbershop or that Barnett carried a gun. Pierce testified that he had not seen much of defendant's companion before and that he had identified the companion at a police station in July 2005.

The State's next witness was Frank Juett, the owner of a nearby barbershop. Juett testified as follows. At approximately 8:30 p.m. on July 8, 2005, he was standing in his shop, when he observed two men running up the street, and he heard Tasha Fuller scream.

The jury then heard a stipulation, entered by the parties, that if Officer Joseph Bembynista were called, he would testify that he has been employed by the Chicago police department for 30 years, that he has been a forensic investigator for 15 years, and that he processed the crime scene located at 1251 North Clyborn Avenue, on July 8, 2005. He recovered a fired bullet from the street, in front of the building; and two fired 9-millimeter cartridge cases. One cartridge case was located on the floor, near the front of the barbershop, and the other was underneath a barber chair. He also recovered a .22-caliber semiautomatic handgun from under some folding chairs. The handgun contained one magazine, which contained nine live rounds of ammunition.

The stipulation further stated that he administered a gunshot residue test: (1) to defendant's hands, on July 8, 2005, at approximately 11:10 p.m.; and (2) to the victim's hands, at the medical examiner's office. The gunshot residue kits, the ammunition, and the handgun were all sent to the Illinois State Police crime laboratory.

Another stipulation between the parties stated that, if Scott Rochowitz were called, he would testify that he was a forensic scientist with the Illinois State Police crime laboratory and an expert in trace analysis. With respect to the gunshot residue tests applied to both defendant and the victim, Rochowitz concluded, "within a reasonable degree of scientific certainty," that both defendant and the victim "may not have discharged a firearm with either hand" or if they "did discharge a firearm, then the particles were not deposited, were removed by activity or were not detected by this procedure." The stipulation further stated that "gunshot residue particles can be effectively removed by washing or wiping the surface, or as with hands, normal hand activity over time will eventually remove the particles."

The State's next witness was the forensic pathologist who performed the autopsy of the victim. Dr. John Scott Denton testified that he was "the interim Chief Medical Examiner at the Cook County Medical Examiner's Office," and that he had performed approximately 3,500 autopsies. The autopsy revealed a gunshot entrance wound to the left temple, above the eyebrow. Doctor Denton did not observe

evidence of close-range firing, which would have been soot or stippling around the wound, left by the firing of the gun. Doctor Denton testified that by close-range firing, he meant firing within 18 to 24 inches. The exit wound was on the right side of the jaw. Other than the entrance and exit wounds, there was one other gunshot wound, which was a graze or scraping wound on the front of the upper right shoulder. The angle of the gunshot, as shown by the exit and entrance wounds, was consistent with the shooter standing in an elevated position, in relation to the victim.

The State's next witness was Brian Mayland, who had been employed as a firearms examiner with the Illinois State Police crime laboratory for 12 years. Mayland examined the ammunition and weapon recovered from the crime scene in this case. It was his opinion that the two 9-millimeter cartridge cases were fired by the same firearm. The bullet could have been fired out of multiple types of guns, such as a 9-millimeter gun or a .38-caliber gun, but not a .22-caliber gun. Mayfield test fired the handgun to determine whether it was working, which it was, except for "an issue with one of the safeties that did not work quite right."

On cross-examination, Mayfield testified that it was possible for the .22-caliber gun to make a clicking sound without actually being fired; and for the trigger to be pulled, without the gun discharging.

The State's next witness was Officer Bryan Cassidy, with the Chicago police department. On July 8, 2005, at approximately 9:30 p.m., he went with other officers to 1230 North Burling Street, where they took defendant into custody. Defendant identified himself as "Delano Williams," although he produced state-issued identification which indicated his name was Brian Walker.

The State's next witness was Assistant State's Attorney Steven Krueger, who testified that in the afternoon of July 10, 2005, he interviewed defendant in an interview room at a police station, and in the presence of a detective. First, Krueger advised defendant of his *Miranda* rights. Defendant waived his rights and agreed to speak to Krueger. After speaking with defendant for approximately 20 or 30 minutes, Krueger asked defendant if he would agree to be videotaped, and defendant refused. However, defendant agreed to have Krueger write down his statement. Then, Krueger spoke with defendant alone for about five minutes to ascertain that defendant had been treated well by the police. Detective Cusack returned, and in his presence, defendant signed a form stating that he had refused a videotape, and Detective Cusack signed as a witness.

Krueger testified that defendant then told him what had happened, and Krueger wrote it down. Krueger then identified the refusal

to videotape form and the statement, both of which were signed by defendant and by Detective Cusack as a witness. The statement was six pages and handwritten by Krueger. After Krueger wrote down defendant's statement, Krueger reviewed the statement with defendant, so that defendant had an opportunity to make corrections, which he did.

The prosecutor then read the statement to the jury. Defendant stated that on the night of July 8, 2005, he went to a barbershop owned by "D" to purchase marijuana. Defendant had purchased marijuana from D several times in the past. When defendant entered the shop, several people were there, and D told defendant to come back later. Outside the barbershop, defendant saw Matthew Moss, who used to be the boyfriend of defendant's sister. Moss went inside the shop for a few minutes and then returned, stating to defendant that he was upset because D would not give him a haircut for $10. Moss told defendant of his intent to rob D and defendant told Moss to be careful because D usually carried a gun.

Defendant further stated that he (defendant) usually carries a gun and that he usually carries it in his left pocket because he is left-handed. Although defendant did not see a gun on Moss, defendant assumed that Moss had a gun, since he intended to rob D. Defendant then entered the shop by himself, and Moss remained outside. Tasha, a hairstylist, was inside the shop, but she exited. Defendant then walked with D to the back room of the barbershop, where defendant gave D $10 and D gave defendant some marijuana. When defendant walked out of the back room and back into the main area of the shop, he saw Moss. Defendant knew that Moss intended to rob D. Moss yelled at D to "low that sh--." Defendant stated "it was Matt's plan to rob D, but he would take any of the money or weed D gave to Matt if Matt was willing to give him some of the money or weed."

Defendant further stated that he had his hand on his gun and that he saw D pull out a small gun and wave the gun toward Moss and defendant. A click came from D's gun, but the gun did not fire. Defendant then pulled out his gun and fired two shots at D. Defendant stated that he "panicked and fired the gun," and then he ran out of the barbershop, to the river, where he threw his 9-millimeter gun. Then defendant ran home and changed his clothes.

During the jury instruction conference, the trial court denied defendant's requests for instructions on self-defense, second-degree murder, and voluntary manslaughter.

In closing, defense counsel argued that defendant entered the barbershop to purchase marijuana from the victim; that the victim pulled his gun first; and that the State's evidence failed to establish

how many guns were present, how many shots were fired, and which shots, if any, were attributable to defendant.

The jury found defendant guilty of first-degree murder, and also found that defendant personally discharged the firearm that proximately caused the victim's death. The trial court sentenced defendant to 35 years for felony murder, plus the mandatory 25-year enhancement for killing with a firearm. After defendant's motion to reconsider the sentence was denied, defendant filed a notice of appeal on July 3, 2007. This appeal followed.

## ANALYSIS

On appeal, defendant claims: (1) that the trial court abused its discretion by allowing the State to proceed on solely a felony murder charge, thereby precluding defendant from seeking jury instructions on self-defense and second-degree murder; (2) that the trial court erred by refusing to allow the defense to present evidence that a co-offender was not charged; (3) that the trial court erred by refusing to give defendant's issues instruction concerning armed robbery; and (4) that defendant's sentence was both excessive and improper, because the trial court considered in aggravation matters that were implicit in the offense and facts unsupported by the evidence.

### Felony Murder Charge

Defendant's first claim is that the trial court abused its discretion by allowing the State to proceed on solely a felony murder charge, thereby preventing him from asking the jury to consider the lesser offense of second-degree murder and the affirmative matter of self-defense.

Our standard of review for this claim is abuse of discretion. The question of whether a trial court erred in allowing the State to dismiss charges is reviewed only for an abuse of discretion. *People v. Williams*, 315 Ill. App. 3d 22, 30 (2000).

The State has nearly unfettered discretion in determining whether to nol-pros a charge. *Williams*, 315 Ill. App. 3d at 30. Before entering a *nolle prosequi*, the State must first obtain the consent of the trial court. *Williams*, 315 Ill. App. 3d at 30. While the trial court has discretion to refuse the State's request, the trial court's discretion is tightly circumscribed. *Williams*, 315 Ill. App. 3d at 30. A trial court may refuse only if it finds either (1) that the State's action is capriciously or vexatiously repetitious or (2) that the dismissal will cause substantial prejudice to the defendant. *Williams*, 315 Ill. App. 3d at 30.

The State also argues that this court should review only for plain error. If a defendant fails to object in a timely manner at trial or fails

to object in a posttrial motion, a reviewing court will generally review the defendant's claim only for plain error. *People v. Piatkowski*, 225 Ill. 2d 551, 564 (2007). "[T]he plain-error doctrine allows a reviewing court to consider unpreserved error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *Piatkowski*, 225 Ill. 2d at 565.

In the case at bar, the State claims that defendant waived this issue by failing to object in a timely manner at trial. Before trial, when the State sought to dismiss the charges other than felony murder, defendant did not object. Much later, during the jury instruction conference at the end of trial, the defense did request jury instructions concerning second-degree murder and self-defense, which the trial court refused. Whether we apply a plain error review or not, the result is the same. There was no error at all. *Piatkowski*, 225 Ill. 2d at 565 (there can be no plain error, if there was no error at all).

Defendant claims that he suffered substantial prejudice because allowing the State to proceed on solely the felony murder charge precluded him from obtaining jury instructions on second-degree murder and self-defense. Defendant is correct that a charge of solely felony murder precludes instructions on second-degree murder and self-defense.

A felony murder defendant is not entitled to a jury instruction regarding second-degree murder, because second-degree murder is not a lesser-included offense of felony murder. *Williams*, 315 Ill. App. 3d at 33. Generally, a defendant may not be convicted of an offense for which he has not been charged. *Williams*, 315 Ill. App. 3d at 31. However, in an appropriate case, a defendant is entitled to have the jury instructed on less serious offenses that are included in the charged offense. *Williams*, 315 Ill. App. 3d at 31. An included offense is an offense that is "established by proof of the same or less than all of the facts or a less culpable mental state (or both)" than that which is required to prove the charged offense. 720 ILCS 5/2—9(a) (West 2006); *Williams*, 315 Ill. App. 3d at 31-32.

A person commits felony murder when he or she, without lawful justification, causes a person's death while "attempting or committing a forcible felony other than second degree murder." 720 ILCS 5/9—1(a)(3) (West 2006); *People v. Phillips*, 383 Ill. App. 3d 521, 535 (2008).

Second-degree murder is not a lesser-included offense of felony murder for two reasons. First, the offense of second-degree murder

requires a particular mental state, namely, the intent to commit murder or great bodily harm, or the knowledge that such acts create a strong probability of death or great bodily harm. 720 ILCS 5/9—2(a) (West 2006) (definition of second-degree murder), incorporating 720 ILCS 5/9—1(a) (West 2006) (intent provisions of first-degree murder); *Williams*, 315 Ill. App. 3d at 33. By contrast, felony murder requires no mental state, independent of the mental state of the predicate felony. 720 ILCS 5/9—1(a)(3) (West 2006) (felony murder provision does not contain an intent requirement); *Williams*, 315 Ill. App. 3d at 32. Second, second-degree murder also requires proof of a mitigating defense. 720 ILCS 5/9—1(a)(1) (West 2006); *Williams*, 315 Ill. App. 3d at 33. Since second-degree murder requires proof of both additional facts and a more culpable mental state, second-degree murder is not a lesser-included offense of felony murder. *Williams*, 315 Ill. App. 3d at 33. As a result, a felony murder defendant, such as the defendant in the case at bar, is not entitled to a jury instruction concerning second-degree murder.

In addition, the second-degree murder statute is specific that this reduced charge is simply not available to felony murder offenders. The statute provides:

"A person commits the offense of second degree murder when he commits the offense of first degree murder *as defined in paragraphs (1) or (2)* of subsection (a) of Section 9—1 of this Code and either of the following mitigating factors are present[.]" (Emphasis added.) 720 ILCS 5/9—2(a) (West 2006).

According to the statute quoted above, the reduced charge of second-degree murder is available to defendants who committed the offense of first-degree murder, only as defined in the first two paragraphs of the first-degree-murder statute. 720 ILCS 5/9—2(a) (West 2006). These two paragraphs require either intent (paragraph (1)) or knowledge (paragraph (2)). 720 ILCS 5/9—1(a)(1), (a)(2) (West 2006). Felony murder is in the third paragraph, which the legislature specifically did not include in its definition of second-degree murder. 720 ILCS 5/9—1(a)(3) (West 2006). Thus, per statute, the charge of second-degree murder is not available to felony murder offenders.

Defendant is also correct that a felony murder defendant is generally not entitled to a jury instruction regarding self-defense. " 'A person who intends to rob a shopkeeper *** is not allowed to claim that he was provoked by his victim or to raise any other affirmative defense, if[,] in the course of committing the original felony, the intended victim or any other person is killed.' " *Williams*, 315 Ill. App. 3d at 33, quoting *People v. Williams*, 164 Ill. App. 3d 99, 109 (1987). There is a narrow exception to this rule. Provocation and belief in the

need for self-defense can be partial defenses to felony murder, if the provocation or the belief in the need for self-defense occurred before defendant formed the intent to commit the underlying felony. *Williams*, 315 Ill. App. 3d at 34. On appeal, defendant does not argue that he qualified for this narrow exception. Thus, defendant is correct that the State's sole charge of felony murder precluded instructions on second-degree murder and self-defense.

On appeal, defendant claims that the trial court abused its discretion in permitting the State to proceed on solely the felony murder charge, because the State's evidence was weak that defendant was involved in the underlying felony, namely, the armed robbery with co-offender Moss.

In essence, defendant is asking us to require trial courts, without any objection from the defense, to make a pretrial assessment of the State's case on the underlying felony, before permitting the State to proceed on solely a felony murder theory. In support of this legal premise, defendant cites a 1989 Maryland case: *Hook v. Maryland*, 315 Md. 25, 42, 553 A.2d 233, 242 (1989). But *Hook* does not stand for this proposition.

In *Hook*, at the close of the State's case-in-chief, the State sought to proceed on *both* the charges of premeditated murder and felony murder, but to dismiss the charge of second-degree murder. *Hook*, 315 Md. at 35 & n.13, 553 A.2d at 238 & n.13. Although the defendant objected promptly, the trial court overruled the objection. *Hook*, 315 Md. at 35, 553 A.2d at 238. On appeal, the Maryland Court of Appeals held that "[t]he rule is: in a capital case, at the request of the defendant, the court shall instruct the jury regarding a lesser included offense, when the evidence warrants such an instruction." *Hook*, 315 Md. at 41, 553 A.2d at 241; *Maryland v. Martin*, 367 Md. 53, 59, 785 A.2d 1270, 1273 (2001) ("*Hook* involved the authority of the State to enter a nolle pros [*sic*] to a lesser included charge").

In Illinois, the result would probably have been the same on the facts as found in *Hook*. Since an intentional murder was charged in *Hook*, a trial court in Illinois would have been required to provide an instruction on second-degree murder, if requested by defendant and if evidence supported the presence of one of the mitigating factors required for second-degree murder. *Williams*, 315 Ill. App. 3d at 37. However, the result in *Hook* has little bearing on a case like the one before us, where no intentional murder was charged; and it certainly does not stand for the proposition that a trial court must make a *sua sponte* pretrial assessment of the State's evidence on the underlying felony, before permitting the State to proceed on solely a felony murder theory.

Even if we were to accept this legal proposition, it would not help defendant. Contrary to his argument, the State's evidence of his involvement in the underlying felony was sufficient for a rational fact finder to find him accountable for the offense, beyond a reasonable doubt. *People v. Martinez*, 242 Ill. App. 3d 915, 923 (1992). The Illinois Criminal Code of 1961 provides that a person is accountable for the conduct of another if "[e]ither before or during the commission of an offense and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." 720 ILCS 5/5—2(c) (West 2006). Consent to the commission of the crime, or mere knowledge of it, is insufficient to constitute aiding or abetting. *Martinez*, 242 Ill. App. 3d at 923. The mere presence of a defendant at the scene of the crime is also insufficient to make a defendant accountable, even if it is coupled with defendant's flight from the scene or defendant's knowledge that a crime was being committed. *People v. Velez*, 388 Ill. App. 3d 493, 512 (2009); *Martinez*, 242 Ill. App. 3d at 923.

While consent, knowledge, presence or flight, each by itself, is insufficient to establish accountability, proof of active participation is not required either. *Martinez*, 242 Ill. App. 3d at 924. Evidence of events both surrounding and following the commission of the offense is competent evidence to show participation in the offense itself. *Martinez*, 242 Ill. App. 3d at 924. The fact finder may consider as factors: defendant's presence during the planning of the offense; his or her presence during the commission of the offense; and his or her flight. *Velez*, 388 Ill. App. 3d at 512; *Martinez*, 242 Ill. App. 3d at 924.

In the case at bar, there was sufficient evidence for a jury to find defendant accountable of the underlying felony, beyond a reasonable doubt. First, in his statement, defendant admitted his advance knowledge of the offense; his presence at its commission; and his subsequent flight with the co-offender. More importantly, he acknowledged his intent to share in the robbery proceeds and his knowledge that both he and his co-offender were armed. Specifically, defendant stated that "he knew Matt was going to rob" the victim, that Matt "always" carried a gun, that defendant believed that "Matt had a gun on him if he was going to rob" the victim, that defendant was carrying a gun in his left pocket; and that defendant "would take any of the money or weed [that the victim] gave to Matt if Matt was willing to give [defendant] some of the money or weed." Second, two eyewitnesses testified that defendant and Moss moved in concert. Tasha Fuller testified that she observed defendant and Moss enter and leave the barbershop, together, twice. Marvin Pierce testified that he observed defendant and Moss on the sidewalk and then saw them enter the barbershop, together, shortly before shots were fired.

In his appellate brief, defendant argues that this evidence of his involvement in the underlying felony is weak when compared to the defendant's admission of the underlying felony in such cases as *People v. Phillips*, 383 Ill. App. 3d 521 (2008). In *Phillips*, where the underlying felony was arson, the defendant admitted in a pretrial statement that he lit some cardboard on fire in a garbage can, without any intent to harm the nearby buildings. *Phillips*, 383 Ill. App. 3d at 532. We fail to see how this admission is stronger than defendant's admission of his intent to share in the robbery proceeds with a man whom he knew was armed.

Defendant argues that we should not allow the State to engage in all-or-nothing "gamesmanship," forcing the jury either to convict on the first-degree charge of felony murder or to let the defendant go free. *Williams*, 315 Ill. App. 3d at 42 (O'Mara Frossard, J., specially concurring). However, defendant is asking us to second-guess the prosecutor's determination, after reviewing the evidence available before trial, not to proceed on the intentional murder charge. In addition, the facts in the case at bar are a far cry from the "gamesmanship" which our colleague criticized in her special concurrence in *Williams*. *Williams*, 315 Ill. App. 3d at 42 (O'Mara Frossard, J., specially concurring). In her special concurrence, Justice O'Mara Frossard accused the State of "gamesmanship" in the case of *People v. Rixie*, 190 Ill. App. 3d 818 (1989), where the State moved to dismiss the charge of first-degree murder *after* all the evidence had been presented and *after* the trial court had already agreed, based on the first-degree murder charge, to instruct the jury on the lesser-included offenses of murder. *Williams*, 315 Ill. App. 3d at 42 (O'Mara Frossard, J., specially concurring), discussing *Rixie*, 190 Ill. App. 3d at 825. Justice O'Mara Frossard found that this dismissal, coming after both the completion of the evidence and the trial court's ruling, was a violation of "fundamental fairness." *Williams*, 315 Ill. App. 3d at 42 (O'Mara Frossard, J., specially concurring). However, these facts are completely different from the facts at bar, where dismissal occurred before trial.

For the foregoing reasons, we find that the trial court did not abuse its discretion when it permitted the State to dismiss the other charges before trial and to proceed solely on the felony murder charge.

## Co-offender Not Charged

Defendant makes two claims concerning Matthew Moss, his uncharged co-offender. First, defendant claims that the trial court erred by barring evidence that the State chose not to charge the co-offender. Second, defendant claims that the trial court erred by altering Illinois Pattern Jury Instructions, Criminal, No. 5.06 (4th ed.

2000) (IPI Criminal 4th). The trial court instructed the jury that a person may be convicted for an offense committed by another person, even though that other person "is not on trial before you." Instead of the quoted words, the instruction required the words "has not been prosecuted."

### (a) Evidence of Uncharged Co-offender

■ Defendant claims that the trial court erred by barring evidence that the State chose not to prosecute the alleged principal in the underlying felony. Defendant claims that this evidence was relevant, because the State sought to hold defendant accountable for the co-offender's conduct.

Evidentiary rulings, like the one at issue here, are generally within the sound discretion of the trial court, and they will not be reversed unless the trial court abused that discretion. *People v. Johnson*, 385 Ill. App. 3d 585, 596 (2008). An abuse of discretion occurs "only where the ruling is arbitrary, fanciful, or unreasonable, or where no reasonable person would take the view adopted by the trial court." *People v. Purcell*, 364 Ill. App. 3d 283, 293 (2006).

Defendant concedes that Illinois courts have generally held that evidence of the disposition of an accomplice's case is irrelevant to a defendant's guilt or innocence. *Martinez*, 242 Ill. App. 3d at 925; *People v. Pryor*, 170 Ill. App. 3d 262, 270 (1988); *People v. Mayden*, 71 Ill. App. 3d 442, 444-45 (1979). However, defendant argues that this general rule does not hold true where defendant is being tried on an accountability theory, the principal has not been charged and the defendant is the party seeking to introduce the evidence.

First, defendant's argument flies in the face of Illinois statutory law, which specifically provides that a person may be convicted on an accountability theory even if the principal has not been charged. 720 ILCS 5/5—3 (West 2006). Section 5—3 provides:

> "A person who is legally accountable for the conduct of another which is an element of an offense may be convicted upon proof that the offense was committed and that he was so accountable, although the other person claimed to have committed the offense *has not been prosecuted* or convicted, or has been convicted of a different offense or degree of offense, or is not amenable to justice, or has been acquitted." (Emphasis added.) 720 ILCS 5/5—3 (West 2006).

See also *People v. Cooper*, 194 Ill. 2d 419, 435 (2000) ("a defendant may be found guilty under an accountability theory even though the identity of the principal is unknown").

Second, this court has previously held that the disposition of an accomplice's case is generally irrelevant, even when the defendant is

being tried on an accountability theory, and when the defendant is the party seeking to introduce the evidence. *Martinez*, 242 Ill. App. 3d at 925-26 (trial court did not err when it excluded the disposition of the principal's case, even though defendant was tried on an accountability theory, and defendant sought to introduce the evidence); *Pryor*, 170 Ill. App. 3d at 269-70 (trial court did not err when it excluded the disposition of a co-offender's case, even though defendant was tried on an accountability theory, and defendant sought to introduce the evidence). This evidence may be relevant for impeachment purposes, but that was not the case here. *People v. Arroyo*, 339 Ill. App. 3d 137, 152 (2003) (an accomplice's testimony may be impeached by his or her conviction, but the offense "cannot be identified as having any connection to the charges pending against the accused").

Third, the reasoning behind defendant's argument is not persuasive. In essence, defendant is claiming that he should have been allowed to argue to the jury that the State had a low opinion of its own case against the co-offender.

First, the State's opinion of the strength of its case is not evidence. It is irrelevant to a jury's determination of guilt or innocence. The jury is the fact finder, and the State's opinion of the facts is not evidence. That is why a trial court specifically instructs the jury that the State's arguments are not evidence and should not be considered as such by the jury.[2] Second, the State's opinion of the strength of its case against one offender is completely irrelevant to the jury's determination of the guilt or innocence of another offender, where evidence may be admissible against one that is not admissible against the other. *Mayden*, 71 Ill. App. 3d at 444-45 (the disposition of an accomplice's case is generally irrelevant, because the evidence against defendant may not be "the same"). For example, in the case at bar, defendant's statement about his co-offender's robbery plan probably would not have been admissible in a prosecution of the co-offender.

Thus, statutory law, precedent of this court and the reasoning underlying both compel us to reject defendant's argument and to hold that the trial court did not abuse its discretion by barring evidence that the State chose not to prosecute the co-offender.

In support of his argument, defendant relies primarily on two cases, both of which have little bearing on this issue: *People v. Burch*, 22 Ill. App. 3d 950 (1974), and *People v. Furby*, 228 Ill. App. 3d 1

---

[2]For example, in the case at bar, the trial court instructed the jury that the evidence was limited to the testimony, exhibits and stipulations received into evidence by the court and that "any statement or argument made by the attorneys which is not based on the evidence should be disregarded."

(1992). In *Burch*, the appellate court held that the defendant did not suffer reversible prejudice by the introduction of his accomplice's conviction, when his own counsel had elicited the fact during his direct examination of the defendant. *Burch*, 22 Ill. App. 3d at 952. In addition, any comment by the prosecutor during closing was merely invited error. *Burch*, 22 Ill. App. 3d at 953-54. Thus, the issue on appeal in *Burch* was *not* whether the evidence should have been admitted or excluded—which is the issue in our case—but whether its admission constituted reversible prejudice to defendant. Since our issue is different, *Burch* has little bearing on our case.

In *Furby*, the appellate court held that there was sufficient evidence in the record to support a jury instruction that a person may be held accountable even if an accomplice "has not been prosecuted." *Furby*, 228 Ill. App. 3d at 7-8. Similarly, in the case at bar, the trial court also found that there was sufficient evidence in the record to give a similar instruction. However, the trial court changed the words "has not been prosecuted" to "is not on trial before you." This change will be discussed in the section below. However, *Furby* does not concern the admission or exclusion of evidence. As the defense notes in its appellate brief, no claim was made in that case regarding the admission of evidence.

For the foregoing reasons, we find no abuse of discretion in excluding the State's decision not to charge the co-offender.

### (b) Nonpattern Jury Instruction

■ Next, defendant claims that the trial court abused its discretion by changing the words in a pattern jury instruction, namely, IPI Criminal 4th No. 5.06. Specifically, the trial court instructed the jury that a person may be convicted for an offense committed by another person, even though that other person "is not on trial before you." Instead of the quoted words, the pattern instruction used the words "has not been prosecuted."

On appeal, a reviewing court will reverse a trial court's determination about what instructions to give only if the trial court abused its discretion. *People v. Rodriguez*, 387 Ill. App. 3d 812, 821 (2008). When deciding whether a trial court abused its discretion, a reviewing court will examine the jury instructions in their entirety, to determine whether they fairly, fully and comprehensively informed the jury of the relevant law. *Rodriguez*, 387 Ill. App. 3d at 821.

Ordinarily, a reviewing court will not reverse a trial court, even if the trial court gave faulty instructions, unless the instructions clearly misled the jury and resulted in prejudice to the appellant. *Rodriguez*, 387 Ill. App. 3d at 821. Thus, even if defendant is correct that the

instruction at issue was faulty, we will not reverse unless the fault created prejudice. *Rodriguez*, 387 Ill. App. 3d at 821.

In addition, we will review only for plain error, because defendant failed to object at trial to the trial court's modification of the pattern instruction. "Generally, a defendant forfeits review of any supposed jury instruction error if he does not object to the instruction or offer an alternative at trial and does not raise the issue in a posttrial motion." *Piatkowski*, 225 Ill. 2d at 564, citing *People v. Herron*, 215 Ill. 2d 167, 175 (2005). "This principle encourages a defendant to raise issues before the trial court, thereby allowing the court to correct its errors before the instructions are given, and consequently precluding a defendant from obtaining a reversal through inaction." *Piatkowski*, 225 Ill. 2d at 564, citing *Herron*, 215 Ill. 2d at 175.

At the jury instruction conference in the case at bar, the trial court and the defense counsel had the following exchange concerning this instruction:

"THE COURT: People's Instruction Number 13 is I.P.I. 5 point 06 with regard to legally—one who is legally responsible for conduct may be convicted for the offense committed by the other person even though the other person who has claimed committed the offense is not on trial before you. Any objection?

DEFENSE COUNSEL: Judge, this is again—this is that issue that we discussed regarding what evidence the jury had before it. I don't know necessarily that given the Court's ruling during the course of the introduction of the evidence that there is *evidence of the other person sufficient to give this instruction.*" (Emphasis added.)

In the above exchange, the defense made no objection to the trial court's modification of the pattern instruction. The defense objected only on the ground that there was insufficient evidence of a co-offender, which is an issue that the defense does not raise on appeal.

In his reply brief, defendant claims that he objected below and cites not only the instruction conference (quoted above) but also cites pages in the record which contain a sidebar during trial, his posttrial motion for a new trial, and the court's ruling on his posttrial motion. None of the pages cited by defendant contain an objection to the wording of the instruction. Since defendant failed to object at trial and in a posttrial motion to the trial court's substitution of words, we will review only for plain error. In a plain error analysis, "the first step" for a reviewing court is to determine whether any error at all occurred in the giving of the instruction. *Piatkowski*, 225 Ill. 2d at 565.

IPI Criminal 4th No. 5.06, the instruction at issue here, states:

"A person who is legally responsible for the conduct of another may be convicted for the offense committed by the other person

even though the other person, who it is claimed committed the offense, [(*has not been prosecuted*) (has not been convicted) (has been convicted of a different offense) (is not amenable to justice) (has been acquitted)]." (Emphasis added.)

In the case at bar, the State offered the following instruction, which the court gave:

"A person who is legally responsible for the conduct of another may be convicted for the offense committed by the other person even though the other person, who it is claimed committed the offense, *is not on trial before you*." (Emphasis added.)

Defendant is correct in that the trial court was required to use the pattern instruction, as written. Supreme court rules require trial courts to use those Illinois Pattern Jury Instructions that are both (1) applicable to the facts and law of the case; and (2) correct statements of law. Supreme Court Rule 451(a) states unequivocally that a trial court "shall" use the "Illinois Pattern Jury Instructions, Criminal (4th ed. 2000)" when it is "applicable in a criminal case, giving due consideration to the facts and the governing law *** unless the court determines that it does not accurately state the law." 210 Ill. 2d R. 451(a); *Piatkowski*, 225 Ill. 2d at 566 (prior version of IPI Criminal 4th was not an accurate statement of the law, because it was internally inconsistent, as previously worded). The use of the word "shall" in the rule makes clear that use of the IPI is not optional, but mandatory. *Ultsch v. Illinois Municipal Retirement Fund*, 226 Ill. 2d 169, 179 (2007) (the use of the word "shall" indicates a mandatory requirement). Although pattern instructions are not themselves law and are open to challenge if they are inaccurate statements of the law, the instructions are mandatory, if applicable and accurate. *Schultz v. Northeast Illinois Regional R.R. Corp.*, 201 Ill. 2d 260, 273 (2003); *Powers v. Illinois Central Gulf R.R. Co.*, 91 Ill. 2d 375, 385 (1982) (although mandated by supreme court rule, IPI instructions are open to legal challenge until "considered" and upheld by our supreme court).

Thus, in the case at bar, the trial court was required to use the pattern instruction, as written, if it was applicable and accurate. There is no dispute on appeal that the words at issue were both applicable and accurate. First, the words "has not been prosecuted" were applicable to the facts at bar, where the co-offender has not been prosecuted. Second, the State has not presented any arguments about how these words could have misstated the law, and we have previously upheld their use in other cases. *E.g.*, *Furby*, 228 Ill. App. 3d at 7-8.

Having found error, we must now examine whether the error resulted in prejudice to defendant (*Rodriguez*, 387 Ill. App. 3d at 821

(even if an instruction was faulty, we will not reverse unless the fault created prejudice)), and if so, whether the prejudice rose to the level of plain error (*Piatkowski*, 225 Ill. 2d at 564). The error is not reversible because of the strength of the State's case and because the jury was otherwise properly instructed.

### Issues Instruction

■ Defendant claims that the trial court erred by refusing to give his issues instruction for armed robbery.

In the pattern instructions, each offense has at least two instructions: (1) a definitional instruction; and (2) an issues instruction. IPI Criminal 4th, User's Guide, at vii. Most definitional instructions provide the statutory definition of the offense, and do not refer to the specific defendant on trial. IPI Criminal 4th, User's Guide, at vii. By contrast, issues instructions apply specifically to the defendant on trial. Issues instructions separate each offense into elements, called "propositions," and list each proposition that the jury must find, beyond a reasonable doubt, in order to convict. IPI Criminal 4th, User's Guide, at vii.

Defendant argues that the committee notes to the pattern jury instructions require trial courts to give the issues instruction for armed robbery, whenever they give the definitional instruction.

The parties disagree about the appropriate standard of review for this issue. The State argues that the abuse of discretion standard, which normally applies to our review of jury instructions, also applies here. Ordinarily, a reviewing court will reverse a trial court's determination about what jury instructions to give only if the trial court abused its discretion. *Rodriguez*, 387 Ill. App. 3d at 821. In contrast, defendant argues that the issue presents solely a question of law, and thus we should review it *de novo*, and he cites the case of *Herron* in support. In *Herron*, the Illinois Supreme Court applied a *de novo* question of review to the question of whether a pattern jury instruction was an accurate statement of the law. *Herron*, 215 Ill. 2d at 174 (the question was whether a pattern jury instruction was accurate when it placed an "or" between each factor, in a list of factors). Similarly, what the pattern instructions require is also a pure question of law. Thus, we agree with defendant that the appropriate standard of review is *de novo*.

In the case at bar, the trial court gave the definitional instruction for armed robbery but not the issues instruction offered by defendant. The pattern instructions state in at least three different places that the trial court acted correctly, given our facts. Those three places are: (1) the User's Guide (IPI Criminal 4th, User's Guide, at viii); (2) the

committee note to the felony murder instruction (IPI Criminal 4th No. 7.01, Committee Note, at 186); and (3) the committee note to the attempt instruction (IPI Criminal 4th No. 6.05, Committee Note, at 171).

First, the User's Guide to the pattern instructions states: "Both the definition and the issues instructions should be given for the offense charged. However, on occasions when an issues instruction refers to an offense which is not charged, only the definitional instruction of that other offense should be given." IPI Criminal 4th, User's Guide, at viii.

Applying these words to the facts of the case at bar shows that the trial court acted correctly. In the case at bar, "the offense charged" was felony murder. The "issues instruction" for felony murder "refer[red] to an offense which is not charged," namely, attempted armed robbery. The User's Guide could not be more clear that when an issues instruction—like the one in our case for felony murder—refers to an offense which is not charged—which in our case was attempt armed robbery—then "only the definitional instruction *** should be given." IPI Criminal 4th, User's Guide, at viii. That is exactly what the trial court did in the case at bar.

Second, the committee note for the felony murder instruction states: "Give Instruction 6.05, defining the offense of attempt following the definition of the forcible felony, when the basis for an instruction on felony murder is an alleged attempt to commit a forcible felony. However, no attempt issues instruction should be given unless the defendant also had been charged with an attempt offense." IPI Criminal 4th No. 7.01, Committee Note, at 186. Since, in the case at bar, defendant was not also charged with an attempt offense, "no attempt issues instruction should [have] be[en] given." IPI Criminal 4th No. 7.01, Committee Note, at 186.

Third, the committee notes following the attempt instruction state that "the court must also give an instruction that defines the offense which is the alleged subject of the attempt." IPI Criminal 4th No. 6.05, Committee Note, at 171. In other words, when giving an attempt instruction, the trial court must give the definitional instruction for the crime attempted. In the case at bar, the trial court did just that: after giving the attempt instruction, it gave the definitional instruction for the crime attempted, namely, armed robbery. However, the committee notes state in the next line: "the issues instruction for that offense should not be given." Acting accordingly, the trial court in the case at bar did not give the issues instruction. IPI Criminal 4th No. 6.05, Committee Note, at 171.

Thus, the pattern instructions state in at least three different places that a trial court should *not* give the issues instruction in the situation at bar.

Defendant claims that the trial court was required to give the issues instruction for armed robbery because: (1) the committee notes to the definitional instruction for armed robbery state, "Give Instruction 14.06 [the issues instruction for armed robbery]"; (2) without it, the *mens rea* for felony murder is removed from the jury instructions; (3) the pattern instructions provide a sample set of instructions, for charges of felony murder, first-degree murder, and home invasion, and they included both the definitional and the issues instructions for home invasion.

None of these arguments have merit. First, in light of the directions in the User's Guide and the committee notes to the felony murder and attempt instructions (discussed above), the direction to give the issues instruction for armed robbery is best understood as a direction to give it when the offense of armed robbery has been charged. Second, the trial court in the case at bar described the *mens rea* for felony murder by giving instructions for accountability, attempt and armed robbery. The accountability instruction required "the intent to promote or facilitate the commission of the offense." The attempt instruction required the "intent to commit the offense of armed robbery." The armed robbery instruction required an "intentional[ ] taking of" property from the person or presence of another person by the use of force or by threatening the imminent use of force. These three instructions adequately described the required *mens rea*. Third, in the sample set, the hypothetical defendant was charged, as a separate offense, with home invasion, and thus the trial court was required to provide both the definitional and the issues instructions for home invasion. However, this sample set provides little guidance for our case, where the sole charge was felony murder and the underlying felony was not charged as a separate offense.

For the foregoing reasons, we find that the trial court did not err by giving the definitional instruction for armed robbery, without the issues instruction for armed robbery.

## Sentencing

Defendant claims that his sentence was excessive. A jury found defendant guilty of first-degree murder, for personally discharging a firearm during the course of an attempted armed robbery. For this conviction, defendant received a sentence of 60 years in prison, which included 35 years for the principal offense and 25 years for personally discharging a firearm that proximately caused the death of Dehombre Barnett.

Defendant claims that this sentence was excessive by 15 years. He received 60 years, and the minimum sentence that he could have

received was 45 years. The minimum sentence for first-degree murder is generally 20 years. 730 ILCS 5/5—8—1(a)(1)(a) (West 2006).[3] However, defendant was subject to a firearm enhancement, which carried a minimum of 25 years. 730 ILCS 5/5—8—1(a)(1)(d)(iii) (West 2006).[4] Thus, the minimum sentence that defendant could have received was 45 years. Since he was 20 years old when charged, and since he is required to serve 100% of his sentence, defendant is arguing that he should be released when he is 65 years old, rather than 80 years old. 730 ILCS 5/3—6—3(a)(2)(i) (West 2006).[5]

Defendant claims that his sentence was excessive because (1) it failed to take into account the factors in mitigation; (2) it was improperly based on factors inherent in the offense charged; and (3) it was premised on factual conclusions unsupported by the record. He asks this court either to reduce his sentence pursuant to Supreme Court Rule 615(b)(4) or to remand for resentencing. 134 Ill. 2d R. 615(b)(4). Supreme Court Rule 615(b)(4) provides a reviewing court with the authority to "reduce the punishment imposed by the trial court." 134 Ill. 2d R. 615(b)(4).

Specifically, defendant claims that the trial court failed to consider mitigating factors such as: his young age (20 years old); his limited criminal history (two adult drug convictions and one adult weapons possession conviction); his potential for rehabilitation (his efforts to obtain a high school equivalency degree); his voluntary support of his three young children; his supportive family; and his belief that he was acting in self-defense.

In addition, defendant claims that, when the trial court stated that defendant pointed a gun at the victim's head and pulled the trigger, the trial court was considering both a fact that was not supported by the record and a legal factor that was already inherent in the charged offense. Defendant argues that there was no evidence in the

---

[3]The statute provides that generally "for first degree murder; (a) a term shall be not less than 20 years and not more than 60 years." 730 ILCS 5/5—8—1(a)(1)(a) (West 2006).

[4]The statute provides that "if, during the commission of the offense, the person personally discharged a firearm that proximately caused great bodily harm, permanent disability, permanent disfigurement, or death to another person, 25 years or up to a term of natural life shall be added to the term of imprisonment imposed by the court." 730 ILCS 5/5—8—1(a)(1)(d)(iii) (West 2006).

[5]The statute provides that "a prisoner who is serving a term of imprisonment for first degree murder or for the offense of terrorism shall receive no good conduct credit and shall serve the entire sentence imposed by the court." 730 ILCS 5/3—6—3(a)(2)(i) (West 2006).

record that defendant pointed a gun at the victim's head and then pulled the trigger. Defendant also argues that killing by use of a firearm was a factor that was already the subject of an enhancement and thus defendant was subject to a double enhancement.

"It is well settled that a trial judge's sentencing decisions are entitled to great deference and will not be altered on appeal absent an abuse of discretion." *People v. Jackson*, 375 Ill. App. 3d 796, 800 (2007). "A sentence which falls within the statutory range is not an abuse of discretion unless it is manifestly disproportionate to the nature of the offense." *Jackson*, 375 Ill. App. 3d at 800. Although the sentencing court in the case at bar chose to give a sentence, which was a *de facto* life sentence, the sentence was still within the statutory range.

"As a general rule, the consideration of a factor which is necessarily implicit in an offense cannot be used as an aggravating factor in sentencing." *People v. Burge*, 254 Ill. App. 3d 85, 88 (1993). "Stated differently, a single factor cannot be used both as an element of an offense and as a basis for imposing a 'harsher sentence than might otherwise have been imposed.' " *People v. Phelps*, 211 Ill. 2d 1, 11-12 (2004), quoting *People v. Gonzalez*, 151 Ill. 2d 79, 83-84 (1992). "Such dual use of a single factor is often referred to as 'a double enhancement.' " *Phelps*, 211 Ill. 2d at 12, quoting *Gonzalez*, 151 Ill. 2d at 85. Our supreme court has cited *People v. White*, 114 Ill. 2d 61 (1986), as a "textbook example of double enhancement." *Phelps*, 211 Ill. 2d at 12. Our supreme court explained: "In *White*, this court held that *** the victim's age cannot form the basis of an extended-term sentence where the defendant is convicted of an aggravated battery of a child." *Phelps*, 211 Ill. 2d at 12.

However, the appellate court has held that "a sentencing court may consider 'the degree of harm threatened' in an armed robbery although threatened harm is implicit in the offense." *People v. Spicer*, 379 Ill. App. 3d 441, 468 (2008), quoting *Burge*, 254 Ill. App. 3d at 89. Similarly, a sentencing court may also consider "the degree of harm in an aggravated criminal sexual assault, although 'serious harm *** [is] an element implicit in the crime.' " *Spicer*, 379 Ill. App. 3d at 468, quoting *People v. Smith*, 215 Ill. App. 3d 1029, 1038 (1991).

The appellate court has held that, in assessing the degree of harm, a sentencing court may consider, for example, whether the victim was particularly young or particularly old, even though the victim's age is an element of the sexual assault count for which defendant was convicted. *People v. Thurmond*, 317 Ill. App. 3d 1133, 1144 (2000); *Spicer*, 379 Ill. App. 3d at 468. For example, in *Thurmond*, the appellate court held that the trial court did not err by considering that the sexual assault victim was only 12 years old, because "there is a differ-

ence between being under age 18 and being significantly under age 18." *Thurmond*, 317 Ill. App. 3d at 1144. Similarly, in *Spicer*, we held that the trial court did not err by considering that the sexual assault victim was over 75 years old, where the age required for aggravated sexual assault was only 60. *Spicer*, 379 Ill. App. 3d at 468.

█ In the case at bar, we find that the trial court considered not a particular degree of harm, but simply the harm itself, which was already the subject of a sentencing enhancement. In *Burge*, we held that the sentencing court did not err in considering the degree of harm threatened in an armed robbery case, where the codefendant brandished a gun in a fast-food restaurant, while the defendant jumped over the counter. *Burge*, 254 Ill. App. 3d at 90. In *People v. Davis*, 252 Ill. App. 3d 812 (1993), the appellate court held that the sentencing court did not err in considering the degree of harm threatened in an armed robbery case, where the defendant ordered a store clerk to perform various tasks, while the defendant pointed a gun at the clerk's head. *Davis*, 252 Ill. App. 3d at 815-16.

By contrast, in the case at bar, there was no evidence that defendant brandished his weapon in front of others or forced the victim to perform tasks at gunpoint. By all accounts, the barbershop was empty except for the two offenders and the victim, and the events unfolded fairly quickly. The sentencing court observed that "within moments" after the hairdresser left the barbershop, shots were heard. According to defendant's statement, the victim pulled his gun after the co-offender made his demand, and defendant shot in response to seeing the victim's gun. There is no evidence that the victim was forced to do multiple tasks at gunpoint, or that psychological or physical harm was inflicted, prior to the killing. In fact, the short time frame suggests just the opposite. In addition, there were no customers who were put in harm's way. Thus, the facts in the case at bar are readily distinguishable from *Burge* and *Davis*, and they do not show a degree of harm beyond the elements required for felony murder and for the firearm enhancement. As a result, the sentencing court erred when it took into account defendant's killing by use of a firearm.

Even if a sentencing court considered an improper factor, resentencing is not necessary, if the record shows that the weight given to the factor was "so insignificant that it did not lead to a greater sentence." *People v. Bourke*, 96 Ill. 2d 327, 332 (1983); *People v. Beales*, 162 Ill. 2d 497, 509-10 (1994). For example, in a murder case, our supreme court found that a sentencing court's observation was "simply a general passing comment," when it observed: "Well, we all know that your conduct caused the ultimate harm. It caused the loss of a human life." *Beales*, 162 Ill. 2d at 509; *Bourke*, 96 Ill. 2d at 330

(the trial court stated that it noted an improper factor "only \*\*\* in passing"). However, if "the reviewing court is unable to determine the weight given to an improperly considered factor, the cause must be remanded for resentencing." *Rourke*, 96 Ill. 2d at 332; *Beales*, 162 Ill. 2d at 509.

From the record, it appears that the defendant's killing by use of a firearm was a significant factor in the trial court's sentencing decision. The trial court stated:

> "I don't know what could motivate someone to take a firearm and put it to the head of someone else, [and] pull the trigger.
>
> Mr. Barnett was shot in the head, although there was no evidence of close range firing, but *the mere act of doing that,* most people couldn't even point a gun at someone's pet, or a family animal, or anything like that.
>
> But although I have been in this building for over 30 years, I find that there is something lacking within you personally or in your character that would allow you to even to conceive of such a notion of going in and pointing a gun at someone and pulling the trigger, whatever selfish motive you might have had for so doing." (Emphasis added.)

The above remarks were more than a passing comment or an observation of the obvious, that someone had died. Rather, the trial court found that there was "something lacking within [defendant] personally" from the act of "pulling the trigger," an act which most people, the court stressed, could not even take toward an animal. Whether we find that this factor was significant or whether we find that its weight is not clear from the record, we must remand for resentencing. Our supreme court requires its appellate courts to remand if we cannot determine from the record "the weight given to an improperly considered factor." *Rourke*, 96 Ill. 2d at 332; *Beales*, 162 Ill. 2d at 509.

For the foregoing reason, we remand for resentencing, with instructions to the sentencing court not to consider, as an aggravating factor, the killing by a firearm.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of conviction, but we remand for resentencing. First, we find that the trial court did not abuse its discretion by allowing the State to proceed on only a felony murder charge, even though defendant was thereby precluded from seeking jury instructions on self-defense and second-degree murder. Second, we find that the trial court did not err by refusing to allow the defense to present evidence that a co-offender was not charged. Third, we hold that the trial court did not err by declining to

give defendant's issues instruction concerning armed robbery. However, we remand for resentencing with instructions that the trial court may not consider in aggravation the killing by a firearm, because that is a matter implicit in the firearm enhancement for the felony murder conviction.

Affirmed in part and reversed in part; cause remanded with instructions.

WOLFSON and GARCIA, JJ., concur.